(November 22, 1916.)

ALAMEDA MINING COMPANY, a Corporation, Respondent, v. SUCCESS MINING COMPANY, a Corporation, Appellant.

[161 Pac. 862.]

MINES—MOTION TO DISMISS APPEAL—APEX OF VEIN—EXTRALATERAL RIGHTS—DIP—STRIKE—STATUTORY CONSTRUCTION—VEIN OR LODE —EVIDENCE—FINDING OF FACTS—FIXING COURSE OR STRIKE—SURFACE—LEVEL—CONTINUITY OF VEIN IN ITS DIP—ACTUAL WORKINGS AS EVIDENCE—EXPERT THEORIES.

1. On motion to dismiss this appeal on the ground that the judgment was interlocutory and not final, *held*, that the judgment was final so far as the principal issue involved in the action was concerned, and that a perpetual injunction was granted and an appeal from an order granting or dissolving an injunction is appealable, under the provisions of sec. 4807, Rev. Codes, as amended by the laws of 1915, p. 193.

2. *Held*, that findings 7, 11 and 13 amount in law to a finding that the Granite claim vein or lode apexes within the surface boundaries of the claim.

3.  As the terms "lodes, veins and ledges," are used in the acts of Congress in regard to mines and mining claims, it was not intended to make distinctions based upon genetic principle; but when precious metals occur in tilted beds in places associated with subsequent fissuring and mineralization, they are subject to location as veins and lodes within the meaning of said acts.

4.  An apex may be defined as that portion of a terminal edge of a vein from which the vein has extended downward in the direction of the dip, as that involves the elements of a terminal edge and downward course therefrom. It is a point from which the vein has a dip as well as a strike.

5.  *Held,* that the evidence clearly shows that the Granite vein has both a strike and a dip.

6.  *Held,* that the fact that the vein terminates against granite or monzonite on the west end does not affect the extralateral rights of the appellant given by the provisions of sec. 2322, Rev. Stats. of the U. S.

7.  *Held,* that the statement by this court in the Stewart-Ontario case, 23 Ida. 724 (738), to wit, "To pursue a vein in the direction of its strike at an angle of less than 45 degrees to the course thereof would clearly not be following the vein on its 'downward course' as authorized by statute," is *obiter,* and not the law, since extralateral rights under the provisions of sec. 2322, Rev. Stats. of the U. S., must be determined by the apex on the surface and not upon the levels disclosed by the working of the mine.

8.  The course of a vein is not determined by its direction at any given point where the vein is a crooked one. An extralateral right must be determined by the course of a vein at its apex at the surface of the claim, or at the nearest point to the surface to which the apex extends.

9.  It is rudimentary that extralateral rights to a vein depend upon the position of its top or apex.

10.  The workings of a mine made in mining operations, and not in support of litigation, should be given more weight as evidence of facts concerning a vein than the mere opinion of expert witnesses.

11.  The main issue tendered by the cross-complaint and answer thereto in this case was as to whether the apex of the Granite vein is within the exterior boundaries of that claim, and the court ought to have made a direct finding on that issue.

12.  *Held,* that the evidence shows continuity of the Granite vein on its dip from the apex to the 1200 foot level.

[As to extralateral rights, under the law as to mining, see note in 58 Am. St. 263.]

APPEAL from the District Court of the First Judicial District for Shoshone County. Hon. William W. Woods, Judge.

Action to obtain a perpetual injunction and to determine the extralateral rights of the defendant to certain mining ground, and to recover damages for the value of ores alleged to have been removed from the Cardiff mining claim; and to quiet title of plaintiff in said Cardiff claim. Judgment for plaintiff. *Reversed.*

J. F. Ailshie and A. G. Kerns, for Appellant.

On the question as to what constitutes a vein or lode, whether the ore deposits be tabular or lenticular or formed in sheets, or are found in seams or fissures, chimneys or a mineralized zone, still it is a vein or lode within the meaning of the law so long as there is a fissure, seam or gouge, or any evidence of mineralization which will lead the practical miner from one ore body to the other and which does in the course of his work so lead him. (1 Lindley on Mines, 3d ed., secs. 286–289; 2 Lindley on Mines, sec. 615.)

An apex is, on cited authority, defined to be all that portion of a terminal edge of a vein from which the vein has extension downward in the direction of the dip. (*Stewart Min. Co. v. Ontario Min. Co.*, 237 U. S. 350, 35 Sup. Ct. 610, 59 L. ed. 991; Lindley on Mines, sec. 310.)

The fact that the vein terminates against the granite or monzonite on the west end in no way interrupts or destroys our extralateral right under the patent and the statute. (*Del Monte M. Co. v. Last Chance M. Co.*, 171 U. S. 55, 18 Sup. Ct. 895, 43 L. ed. 72, 19 Morr. Min. Rep. 370; *Clark v. Fitzgerald*, 171 U. S. 92, 18 Sup. Ct. 941, 43 L. ed. 87; *Tyler Min. Co. v. Sweeney*, 54 Fed. 292, 4 C. C. A. 329.)

The extralateral right conferred by the statute and conveyed by the patent is determined by the apex on the surface upon which the prospector makes his location, and not upon the levels in the depths of the earth opened and disclosed many years thereafter. (*Flagstaff S. M. Co. v. Tarbet*, 98

U. S. 463, 25 L. ed. 253; 1 Lindley on Mines, secs. 318, 319; *Carson City Gold & Silver Min. Co. v. North Star Co.*, 73 Fed. 597; *Pennsylvania Cons. Min. Co. v. Grass Valley Exploration Co.*, 117 Fed. 509; *Last Chance Min. Co. v. Bunker Hill & Sullivan M. & C. Co.*, 131 Fed. 579, 66 C. C. A. 299; *Walrath v. Champion Min. Co.*, 171 U. S. 293, 18 Sup. Ct. 909, 43 L. ed. 170, 19 Morr. Min. Rep. 410.)

The strike or course of a vein on any level is determined by a "horizontal line drawn between its extremities" so far as the vein has been exposed or ascertained with reasonable certainty. (1 Lindley on Mines, sec. 318.)

The court erred in not making a direct and positive finding as to whether the apex of the Granite vein is within the exterior boundaries of the Granite claim. That was the sole and essential issue tendered by the cross-complaint and answer, and under section 2322, Rev. Stats. U. S. (U. S. Comp. Stats. (1916), sec. 4618; 5 Fed. Stats. Ann., p. 13), a finding therein was imperative. (*Lorenzi v. Star Market Co.*, 19 Ida. 674, 115 Pac. 490, 35 L. R. A., N. S., 1142; *Penninger Lateral Co. v. Clark*, 22 Ida. 397, 126 Pac. 524.)

John P. Gray and Walter H. Hanson, for Respondent.

Where there is evidence to support the finding of the court and the judgment, the judgment will not be reversed. (*Brown v. Grubb*, 23 Ida. 537, 130 Pac. 1073; *Brinton v. Steele*, 23 Ida. 615, 131 Pac. 662; *Smith v. Faris-Kesl Const. Co.*, 27 Ida. 407, 150 Pac. 25; *Bower v. Moorman*, 27 Ida. 162, 147 Pac. 496; *Commercial Trust Co. v. Idaho Brick Co.*, 25 Ida. 755, 139 Pac. 1004; *Henry Gold M. Co. v. Henry*, 25 Ida. 333, 137 Pac. 523; *Hufton v. Hufton*, 25 Ida. 96, 136 Pac. 605.)

The burden was on defendant to establish its rights clearly and satisfactorily. (*Consol. Wyoming Co. v. Champion Co.*, 63 Fed. 540, 18 Morr. Min. Rep. 113; *St. Louis Co. v. Montana Co.*, 194 U. S. 235, 24 Sup. Ct. 654, 48 L. ed. 953; *Stewart M. Co. v. Ontario M. Co.*, 23 Ida. 724, 132 Pac. 787; *Leadville M. Co. v. Fitzgerald*, Fed. Cas. No. 8158, 4 Morr. Min.

Rep. 380–385; *Duggan v. Davey,* 4 Dak. 110, 26 N. W. 887, 17 Morr. Min. Rep. 59.).

The learned counsel who represents the appellant asks this court to overrule the decision which he himself, while a member of this court, announced, which clearly declares the doctrine that the right to pursue a vein extralaterally is limited to an angle of 45 degrees with its course. (*Stewart Min. Co. v. Ontario Min. Co., supra; Argentine M. Co. v. Terrible M. Co.,* 122 U. S. 478, 30 L. ed. 1140, 17 Morr. Min. Rep. 109; *Duggan v. Davey, supra.*)

It was not the intention of the law to allow a person to make a location crosswise of the vein, so that the side-lines shall cross it, and thereby give him the right to follow the strike of the vein outside of his side-lines. (*Del Monte M. & M. Co. v. Last Chance M. & M. Co.,* 171 U. S. 55, 18 Sup. Ct. 895, 43 L. ed. 72, 19 Morr. Min. Rep. 370.)

The ore bodies in the Cardiff cannot be reached by following downward. (*Southern Nevada G. & S. M. Co. v. Holmes M. Co.,* 27 Nev. 107, 103 Am. St. 747, 73 Pac. 759.)

The general course of the vein was across the claim, and even though a part of the apex passed through the west end-line, it would not necessarily make that an end-line in law. (*Empire State-Idaho M. & D. Co. v. Bunker Hill & S. M. & C. Co.,* 131 Fed. 591, 66 C. C. A. 99; Lindley on Mines, sec. 584; *Consol. Wyoming M. Co. v. Champion Min. Co.,* 63 Fed. 540, 18 Morr. Min. Rep. 113; *St. Louis M. Co. v. Montana M. Co.,* 102 Fed. 430, 42 C. C. A. 415, 20 Morr. Min. Rep. 507, 186 U. S. 24, 22 Sup. Ct. 944, 46 L. ed. 1039.)

It is impossible to start from the ore bodies beneath the Cardiff claim where the trespass has been committed and follow upward along the dip or within 45 degrees of the dip and reach any part of the so-called apex of any of the east-west ore chutes. (*King v. Amy & Silversmith Con. M. Co.,* 152 U. S. 222, 14 Sup. Ct. 510, 38 L. ed. 419, 18 Morr. Min. Rep. 76; *Jim Butler Tonopah M. Co. v. West End Consol. M. Co.* (Nev.), 158 Pac. 876.)

SULLIVAN, C. J.—This action was brought by the Alameda Mining Company, respondent, against the Success Min-

ing Company, appellant, praying for a perpetual injunction enjoining the Success Mining Company from entering upon or into or excavating and removing ore from the Cardiff mining claim owned by the plaintiff, and for $30,000 damages alleged to be the value of ores removed from the said Cardiff claim, and to quiet the title of plaintiff in said Cardiff claim.

The Success company answered, denying the allegations of the complaint, and filed a cross-complaint, alleging the ownership of the Granite mine and of the vein, lode or ledge thereunder, and that the Granite vein apexes within the exterior boundaries of the Granite claim, and that the said vein crosses the east end-line of said Granite claim and that in pursuing said vein on its dip and downward course between vertical planes extending downward through its parallel endlines, the said vein passes under and beneath the south sideline of said Granite claim into and beneath the surface of the said Cardiff lode claim, and based such claim or right upon the provisions of sec. 2322, U. S. Rev. Stats. (U. S. Comp. Stats. (1916), sec. 4618, 5 Fed. Stats. Ann., p. 13). This case involves the question of extralateral rights.

Upon the issues made by the pleadings, the case was tried by the court without a jury. By permission of the court the question of extralateral rights was tried first, and it was understood and agreed that if that question were decided in favor of the plaintiff, then the question of accounting should thereafter be tried. After trying the question of extralateral rights, the court made its finding of facts and conclusions of law and entered judgment denying the Success company the right to pursue said vein under and beneath the surface of the Cardiff claim, and denying the Success company any extralateral rights whatever underneath the Cardiff claim.

The question of the value of the ore extracted from the Cardiff claim had not been tried and determined at the time this appeal was taken.

The appeal is from the judgment quieting the title to the Cardiff lode claim in the plaintiff and perpetually enjoining the defendant from asserting any right, title or interest in

and to any extralateral rights under said Cardiff lode claim or the ores and minerals therein adverse to the plaintiff.

*In limine,* respondent has made a motion to dismiss this appeal on two grounds: First, that the appeal is from an interlocutory judgment and not from a final judgment; second, that said appeal is from a decision that is not appealable and is premature.

There is nothing whatever in either of the grounds above stated. The judgment entered is a final judgment, so far as the rights of the Success Mining Company are concerned, in extracting any ore from beneath the surface of said Cardiff claim, and the only matter remaining for determination is the value of the ore which the Success company has extracted therefrom. The judgment decreed that "the defendant be forever enjoined from asserting any right, title or interest in or to the said Cardiff lode claim or the ores and minerals therein, adverse to the plaintiff," thus holding that the Success Mining Company had no extralateral rights within the boundaries of the Cardiff mining claim. The judgment of the court in part is as follows:

"It is now ordered, adjudged and decreed that the title to the Cardiff lode claim be and the same hereby is quieted and confirmed in the Alameda Mining Company against the Success Mining Company, and the defendant be forever enjoined from asserting any right, title or interest of, in or to the said Cardiff lode claim, or the ores or minerals therein, adverse to the plaintiff.

"It is further ordered, adjudged and decreed that the plaintiff do have and recover of and from the defendant the value of the ores and minerals heretofore mined by the defendant from beneath the said Cardiff lode claim as the same shall be hereafter, by a further judgment, fixed and determined, and said matter is continued until the next term of court, and that such further proceedings shall thereupon be taken thereon as are customary in equity and judgment be entered therefor."

. That is a final judgment so far as the principal issue involved in this action is concerned. Again: Under the pro-

visions of sec. 4807, Rev. Codes, as amended by the laws of 1915, p. 193, an appeal may be taken to the supreme court from the district court "from an order granting or dissolving an injunction."

Here a perpetual injunction was granted against the Success company, whereby that company was forever enjoined from asserting any right, title or interest in or to said Cardiff lode claim or the ores and minerals therein adverse to the plaintiff.

The question of an accounting for the ores extracted by the Success company from said Cardiff lode claim is the only question that was left in the case for trial, and regardless of how that accounting may result, it can in no manner affect in any way the judgment already entered in said case. The motion is denied.

Counsel first discusses errors numbers 2 to 15, inclusive, and states that said assignments involve questions so intimately related that the discussion of one will naturally blend in the others, and proceeds to discuss said assignments under two general propositions. First, that the findings of fact in this case, when reduced to their final analysis, do not support the conclusions of law and judgment in the case; and, second, that if it should be held that those findings of fact are sufficient to support the conclusions of law and judgment, then they are clearly contrary to all the substantial evidence in the case.

It is contended that the essential and important paragraphs of the findings of fact bearing on the issues presented by the cross-complaint are 7, 11 and 13, which are as follows:

## "VII.

"The court further finds that there is within the Granite mining claim and extending from the Granite claim into the Cardiff claim upon its onward course or strike, a lode containing lenses or lenticular bodies of ore or ore chutes; that the said ore chutes or lenses are irregular in form and of various sizes, representing replacement along shrinkage fissures or cracks. A number of said ore chutes or fissures have

an easterly and westerly direction and cut the bedding planes of the sedimentary rocks.

"That the foot-wall of the area so mineralized is represented by a hard foot-wall of quartzite, which is disclosed for its longest distance upon the 300 foot level of the Success property, and upon said level, as shown upon the defendant's exhibits, has a course of approximately N. 10 degrees West, which represents the extreme easterly limit of the mineralization and fissures.

"That the area which is mineralized and which contains said ore-bearing fissures or lenses or chutes, terminates on its westerly side against granite or monzonite more irregular than the beds of quartzite representing the foot-wall quartzite.

"Within the said area are a large number of lenses or ore chutes variously called the 'North' vein or spur, the 'Dorsey,' the 'South' and the 'Peterson.'

"In addition to the fissures, chutes or ore bodies having an easterly and westerly direction between the said foot-wall quartzite and monzonite, there is one long ore body or chute having a course of North 30 degrees West, which more nearly conforms to the bedding and extends for a long distance in a northeasterly and southerly direction, and which has been developed and followed upon its strike on the 400, 450 and 700 foot levels into the Cardiff lode claim by the defendant. Said ore chute has been developed and mined for several hundred feet upon its strike.

"That the said ore chute or ore body which has the said course of North 30 degrees West, dips southwesterly at an angle of approximately 60 degrees from the horizontal."

## "XI.

"The court further finds that at least three of the lenses or ore chutes which cut the bedding and have an easterly and westerly course reach to or near the surface within the Granite lode and the principal of which extends from certain stopes which come to the surface near the 4400 contour in a course slightly north of east to a stope which comes to the surface near the elevation 4475.

"That the south ore chute is disclosed at the surface having a northeasterly and southwesterly course at elevation 4492.

"Extending from the said stope at elevation 4475 the ore body or ore chute which follows the bedding planes extends easterly and is disclosed on the surface at the top of a raise at elevation 4487. From that point to the east end line of the Granite claim the vein is not disclosed upon the surface, but near the top of raise 4587 a tunnel has been extended called the 'Apex' tunnel along what the court finds to be the extension of the said vein or ore chute, easterly, which said tunnel follows the same and has a course of approximately North 28 degrees West.

"That the same ore body has been followed by a raise up to the Granite State tunnel where the said vein is also disclosed, but in the said Granite State tunnel has a course of approximately North 15 degrees West and which has been followed thence upward in a raise to a point where it crosses the east end line of said Granite State tunnel at the elevation of 4687 feet.

"The court finds that from the top of the stope at elevation 4475 running easterly the mountain rises very rapidly in an easterly direction. That the lode terminates on its northwesterly course within the said Granite lode claim."

"XIII.

"The court further finds that the portion of the lode hereinbefore referred to as extending from the stope at elevation 4475 to the raise at elevation 4687 represents an exposure of a portion of the lode partially upon the line of strike and partially upon the line of its dip."

It is contended that the last three quoted findings of fact amount, in law, to a finding that the Granite claim vein or lode apexes within the surface boundaries of the claim, and that it crosses the east end-line of the Granite State tunnel at the elevation of 4,687 feet. That elevation, it appears, is the surface elevation at the point of the east end-line of the Granite claim where the vein crosses said line on its southeasterly course.

By said seventh finding, the court finds that there is within the Granite mining claim, and extending from the Granite claim into the Cardiff claim upon its onward course or strike, a lode containing lenses or lenticular bodies of ore or ore chutes. The court also finds that these various ore bodies or chutes or lenses extend upward to the surface at various points and thence downward into the depths of the earth, and that they have been followed and mined downward into the depths of the earth.

It also appears that the first evidence of any entry of the Granite vein under the surface of the Cardiff claim is on the 400 foot level, which, it appears, is at a distance of about 609 feet below the elevation at which the vein at its apex crosses the east end-line of the Granite claim. From the evidence there can be no doubt of the existence of the Granite vein and its location, course and apex.

So far as the apex of the Granite claim is concerned, during the trial the Success company offered to adduce further testimony in regard to the apex, and objection was made by opposing counsel that such evidence was cumulative, and the court said: "It is cumulative. . . . . I think I have heard enough evidence. I think any court would be perfectly satisfied in regard to the claim of the apex within the boundaries of the Granite claim." Here, apparently, the trial court recognized that the Success company had established the apex to the vein in said claim.

There can be no doubt as to the definition of a vein or lode, as those words are used in the statutes of the United States, in the face of the multitude of judicial expressions on that subject. (See *Book v. Justice Min. Co.*, 58 Fed. 106, 18 Morr. Min. Rep. 617; *Jupiter Min. Co. v. Bodie Con. Min. Co.*, 11 Fed. 666, 7 Sawy. 96, 4 Morr. Min. Rep. 411; 1 Lindley on Mines, 3d ed., secs. 286–289.)

In vol. 1, Lindley on Mines, the author states in a note at the bottom of page 649, as follows:

"The acts of Congress are so construed as to include in the category of lodes, veins, and ledges certain deposits which would not fall under the above definition. As, for example,

certain tilted beds or sedimentary strata containing ores as original constituents, and not formed by subsequent fissuring and mineralization.   The geologist would call these beds, and not lodes, but we understand that the intent of the law is not to make distinctions based upon the genetic principle.   It is doubtless true that a very small percentage of the ore deposits of the precious metals occur as tilted beds in place, unassociated with subsequent fissuring and mineralization; but when such are found, they are undoubtedly subject to location as veins or lodes within the meaning of the statutes.''

In vol. 2, Lindley on Mines, sec. 615, p. 1479, the author says:

''A vein to be followed must be continuous only in the sense that it can be traced by the miner through the surrounding rocks.   Continuous ore is doubtless the best evidence, but it is not essential.   Many veins carry only small 'shoots' of ore, and the intervening spaces are represented only by a continuous fissure with or without gangue and gouge material.''

Tilted beds of sedimentary strata containing ore the geologist would call beds and not lodes, but as suggested by Mr. Lindley, as above quoted, we understand that the intent of the law is not to make distinctions based upon genetic principle. The geologists who testified as witnesses for plaintiff in this case have attempted to draw the distinction suggested by Mr. Lindley, but from our view of the evidence, it is very conclusive that there is a vein in the Granite claim with an apex within the boundaries of said claim, and that said vein has a strike and a dip.

A vein or lode comes within the meaning of the law so long as there is a fissure, seam or gouge or any evidence of mineralization which will lead the practical miner from one ore body to another, and which does in the course of his work so lead him.   Such evidence of mineralization of said lode or vein clearly appears from the evidence contained in the record.

In *Stewart Min. Co. v. Ontario Min. Co.*, 237 U. S. 350, 35 Sup. Ct. 610, 59 L. ed. 991, in referring to the apex of the vein, the court said:

"An apex is, on cited authority, defined to be 'all that portion of a terminal edge of a vein from which the vein has extension downward in the direction of the dip.' And it is further said that the definition has been approved in Lindley on Mines, because, as therein expressed, it 'involves the elements of terminal edge, and downward course therefrom.' We may accept the definition."

In the same case (23 Ida. 724, 132 Pac. 787) this court held that an apex must be the top or terminal edge of the vein on the surface or the nearest point to the surface, and must be the top of the vein proper rather than of a spur, and must be a point from which the vein has a dip as well as a strike.

As to the course of the vein, in its finding of facts the court found the "lenses or ore chutes . . . . have an easterly and westerly course reaching to or near the surface within the Granite lode and . . . . comes to the surface near the 4,400 contour in a course slightly north of east to a stope which comes to the surface near elevation 4,475," and also that the "ore body or ore chute, which follows the bedding planes, extends easterly and is disclosed on the surface at the top of raise at elevation 4,487," and is again disclosed "at the top of raise 4,587." Those findings are clearly equivalent to a finding that the apex is within the surface boundaries of the Granite claim.

The 13th finding of the court is that "the portion of the lode hereinbefore referred to as extending from the stope at elevation 4,475 to the raise at elevation 4,687 [which is the apex raise at the east end-line] represents an exposure of a portion of the lode partially upon the line of strike and partially upon the line of its dip."

The evidence clearly shows that the vein has both a strike and a dip; a strike to the southeast and a dip to the southwest. The fact that the vein terminates against the granite or monzonite on the west end does not affect the extralateral rights given by the provisions of sec. 2322, U. S. Rev. Stats. (U. S. Comp. Stats. (1916), sec. 4618, 5 Fed. Stats. Ann., p. 13.) Under a uniform line of authorities, the Success company, under the evidence in this case, would be entitled

to have the west end vertical plane of the Granite claim pass through the point where the vein terminates against the monzonite and parallel with the vertical plane of the east end-line, thus giving it the extralateral right of the pursuit of the vein between those planes beneath all other mining claims which it dips.

The trial court apparently clearly recognized that the evidence of the appellant was amply sufficient to establish the fact that the apex of said vein was within its boundary lines, since when further evidence was offered the court stated: "It is cumulative. . . . . I think any court would be perfectly satisfied in regard to the claim of the apex within the boundaries of the Granite claim." And it would seem that the decision of the court that in the levels 400, 450 and 700 the vein of the Granite claim passed under the south side-line thereof and beneath the Cardiff claim more upon the strike than upon the dip, or, in other words, that the angle was less than 45 degrees and that for that reason the appellant could not pursue the vein under the Cardiff claim, was evidently based upon the decision of this court in the Stewart-Ontario case, 23 Ida. 724, 132 Pac. 787, wherein it was stated that "to pursue a vein in the direction of its strike at an angle of less than 45 degrees to the course thereof, would clearly not be following the vein on its 'downward course' as authorized by statute." That statement was clearly *obiter* in that case, and is not the law, since the extralateral right conferred by the provisions of sec. 2322, Rev. Stats. of the U. S., is determined by the apex on the surface upon which the prospector makes his location and the dip of the vein, and not upon the levels in the depths of the earth opened and disclosed in the working of the mine.

It is clear from all the decisions that the course of a vein is not determined by its direction at any single given point where the vein is a crooked one. The vein in the Granite claim crosses the east end-line thereof. The appellant's extralateral rights must be determined by the course of the vein at its apex at the surface of the claim.

It was held in the *Flagstaff S. M. Co. v. Tarbet*, 98 U. S. 463, 25 L. ed. 253, that the most practicable rule is to regard the course of the vein as that which is indicated by surface outcrop, or surface explorations and workings. It is on this line that claims will naturally be laid, whatever be the character of the surface, whether level or inclined.

Mr. Lindley, in commenting upon that case, in vol. 1, sec. 318, Lindley on Mines, says:

"In addition to this, the lower levels of a mine frequently show a different direction from that which guided the miner in making his location, and are at variance with conditions shown in opening nearest to the surface."

It appears from the evidence that the vein at its westerly end, where it terminates against the monzonite, is nearly vertical, and that it extends downward in its course to the east and dips to the southwest, and on the lower levels it passes out to the southeast under the south side line of the Granite claim. On the surface of the location, the vein crosses the mountain within the surface boundaries of the Granite location and the east end-line of said location crosses the vein. If the mountain were cut down so as to make a horizontal plane struck at about elevation 4,375 feet, which plane would strike the most westerly outcroppings of the vein, the easterly end of the vein, so far as exposed on that horizontal, would pass out on the south side of the Granite claim, instead of the east end-line of the claim.

It was said by Judge Beatty in *Carson City G. & S. M. Co. v. North Star Min. Co.*, 73 Fed. 597: "As ledges may, in their depths, change their course, and as the surface course, or the course of the apex is to govern the miner's rights, the workings nearest the surface are better guides to the course of the apex than those far below."

Mr. Lindley, in commenting upon the case in sec. 318, Lindley on Mines, says: "The true method of determination is found in the rule laid down by the supreme court of the United States in the Flagstaff case, and followed by Judge Beatty in the North Star case, that the workings nearest the

surface are better guides to the course of the apex than those far below.''

In the *Pennsylvania Con. Min. Co. v. Grass Valley Exploration Co.,* 117 Fed. 509, 22 Morr. Min. Rep. 306, the court said:

''It is contended that the strike of the vein at this point is such that it cannot be the same vein as the one found at or near the surface. This fact would be of some importance if the vein was an ideal one, maintaining a uniform strike and dip throughout its entire course. But it is not an ideal vein, and there are very few such to be found.''

The evidence shows that the vein of the Granite claim is not an ideal one.

In the *Last Chance Min. Co. v. Bunker Hill & Sullivan M. & C. Co.,* 131 Fed. 579, 66 C. C. A. 299, it is held that where the end-lines of a lode claim cross the surface outcroppings of a vein, they determine the extralateral right of the claim, without regard to the angle at which they cross the general course of the vein; its course for that purpose being fixed by the course of the apex on the surface of the claim, and it is said: ''The extralateral right to a vein or lode outcropping at the surface, where it exists is fixed by the course of the vein or lode at the surface, and not by its course on a level.''

The supreme court of the United States in the Stewart-Ontario Min. case, 237 U. S. 350, 35 Sup. Ct. 610, 59 L. ed. 989, said: ''It is rudimentary that extralateral rights to a vein depend upon the position of its top or apex.'' (See, also, 2 Lindley on Mines, sec. 364.)

Geologists who testified for the appellant testified very clearly as to the course or strike of the Granite vein on every level commencing with the apex of the vein, extending down to the 1200 foot level; and as we understand their testimony, it shows that the general course or strike of said vein crosses the plane of its end-line at an angle greater than 45 degrees, and that appellant is not pursuing the vein in the direction of its strike. We think that the plats of the various levels and the model of the workings of said mine, which were introduced in evidence, support that proposition.

One of said experts testified as follows, referring to the Granite claim: "I found ore bodies in place in that lode claim. I found a vein on the 700 foot level and I also found a vein on the surface. I think there is complete continuity from the apex on the surface through the mine workings generally. The ore has been stoped out down to the 700 foot level. The same ore body is one and the same, identical."

Referring to the 200 foot level, he said: "All the fissures that form the vein have come together on this level, and seem to be part and parcel of the same vein system."

Referring to the 400 and 450 foot levels and the vein therein, he testified: "This is the same vein we have traced from the surface downward, and the various spurs are the same spurs that we have described and the connection and the junctions between the different veins are on this level just as they have been described previously." And as to the location of said claim, he testified: "The Granite lode claim was a very well located claim with reference to the apex of the vein. The claim is located lengthwise of the formation, as shown on the ground." As to the proper method to ascertain the course of a vein on a strike, he testified: "To ascertain the course of a vein on its strike you take the mathematical mean of all the different short courses which go to make up the full length of the vein and that would be mathematically represented by a line drawn from between the extremities of the vein."

Counsel for respondent lays special stress upon a sentence contained in the Ontario case, to the effect that you cannot pursue a vein in the direction of its strike at an angle of less than forty-five degrees to its course. As we view it, that statement in that opinion was mere *dictum,* and we concur in what is said in 1 Lindley on Mines, 3d ed., at sec. 319 (p. 730), as follows: "We know of no legal principle to support this latter deduction, that an extralateral right cannot be exercised where the angle the extralateral planes form with the line of strike of the vein is less than forty-five degrees. The adoption of an arbitrary angle beyond which such rights may not be exercised is hardly within the province of the courts.

In a subsequent section we have pointed out that the locator may place his end-lines at an angle so long as they cross the apex of the vein."

Respondent tried this case upon the theory that the vein or lode in question was composed of lenses or separate ore bodies; but the evidence is very conclusive that the Granite lode involved was one vein or lode, and was not composed of separate ore bodies without any connection whatever between them.

Mr. Searls, the expert geologist for the plaintiff, admitted on cross-examination that he believed that all of the veins, spurs and fissuring system of the Granite claim were formed contemporaneously and constitute a "one fissuring system."

Expert geologists for the plaintiff endeavored to introduce by their testimony a new theory, to the effect that the ore bodies to be found in the mines in the Coeur d'Alene region are not entitled to be dignified by the name of veins, but that they should be known as "lenticular ore bodies" and "tabular ore shoots," and to thereby show that no extralateral rights would attach to said ore bodies under the provisions of sec. 2322, U. S. Rev. Stats. (U. S. Comp. Stats. (1916), sec. 4618, 5 Fed. Stats. Ann., p. 13.) The great weight of testimony in this case is against that theory.

One of the experts for defendant testified that the ore of the Success mine contained such minerals as are characteristic of contact metamorphic deposition and said:

"This has nothing to do with the question whether there are veins in the mine or not. That is a matter purely of the shape of the ore bodies and the mineralization of the fissures." And again: "The bend in the Granite vein indicated on the various levels, as separating a segment which has an easterly and westerly course, from a segment that has a southwesterly course, is not unusual in places; we have the Prichard formation—in fact, the Coeur d'Alene district, as a whole—in fact, there are very few straight veins in the district; but crooked veins are the rule."

It was said by the court in *Carson City G. & S. M. Co. v. North Star M. Co.*, 73 Fed. 597: "The workings of a mine,

made in mining operations, and not in support of litigation, are generally important as evidence of any facts which may be legitimately inferred from them.''

In the case at bar, it is proper to consider that the proof of the actual working of the mine, the way it was worked, what was found therein and the condition of the many open stopes and veins, since many of those stopes have been worked out and from some of them thousands of tons of ore taken, as shown by the evidence, is certainly better evidence of the course, dip, angles, spurs and character of the vein than any expert testimony that could be given.

Mr. Elton, one of the witnesses for the appellant, was a metallurgical engineer, and in 1911 opened up and developed the Success mine. Prior to his employment the principal levels in said mine had been worked out for lead and silver and the zinc ore had been left in the mine. He testified in part as follows:

''There were various holes designated 'ore bodies' that were not then connected from one level to the other. I connected up the open places I have described to the court and found them continuous all the way. I never found an isolated ore body in any place. I either found continuous ore or I would have something to follow. Some places would have a gouge and other places would have a mineralized streak of vein. . . . . I went from the point marked (stope) easterly. I always went in both ways and it is open clear up above here. It extended up to the grass roots. . . . . So far as I know those spurs always united with the Granite vein. I never knew a separate ore body to show up. There was always a connection with the main vein. . . . . I went through the drift and the ore vein matter shows up the same ore on out to here. I wanted to stope through to the surface there but they stopped me. I considered that the apex of the vein at that time and asked Mr. Samuels to let me drive it through at that time. . . . . ''

This witness showed that he was familiar with every part of the workings of said mine, and that he never discovered any separate veins or two-segments or anything that would

justify the theory that said ore bodies in said mine were lenticular or tabular ore shoots without any vein whatever.    His testimony shows that all ore bodies found within the mine were connected at some place and united with the main Granite vein and were a part of said vein.

Other witnesses who had worked in the mine testified to the taking out of commercial ore at various places in the apex tunnel and in following the vein from the portal of the tunnel to its face at the vertical plane of the east end-line.

Sacks of commercial ore were introduced as exhibits.    Theories sometime must give way to actual facts.    (*Petajaniemi v. Washington Water Power Co.*, 22 Ida. 20, 124 Pac. 783.) The positive testimony of miners who mined the ore and developed the mine and the engineers and others who made actual surveys of the mine must be taken for more than the speculative theories of the experts of the geology and formation of ore bodies and the mineralization of veins.    Physical facts should be given greater weight than mere expert opinions and speculative theories.

The court erred in not making a direct and positive finding as to whether the apex of the Granite vein is within the exterior boundaries of the claim.    This was the main issue tendered by the cross-complaint and answer thereto, and under the provisions of sec. 2322, Rev. Stats. of the U. S., the court should have made a finding thereon.    The findings of the court, however, clearly infer that the apex of said vein is within the boundaries of the Granite claim.

It is not necessary for us to especially review all of the errors assigned.    But we conclude that under the evidence said Granite vein has its apex within the boundaries of the Granite claim, and that such vein crosses the east end-line of the claim, and its westerly end terminates against granite or monzonite, and at that point the vein is nearly vertical, and that it extends down into the earth at a slight dip to the southwest.    Simply because the vein is cut off at that point by granite or monzonite is no reason why it may not be followed on its dip downward within the vertical planes be-

tween the east end-line and the point where the vein ends against the granite.

Under the provisions of sec. 2322, U. S. Rev. Stats., the appellants are given the right to pursue the veins, lodes and ledges throughout their entire depth, the top or the apex of which lies inside of the surface lines of said claim extended downward, although such veins, lodes or ledges may so far depart from a perpendicular in their course downward as to extend outside of the vertical side-lines of the surface location. Appellant has pursued the vein within the vertical planes of the end-lines and has not passed beyond them, and the evidence clearly shows the existence of a vein or lode in the Granite claim and establishes its identity and continuity from the surface downward to the 1,200 foot level.

The case will be remanded to the trial court to make findings of fact and enter judgment in favor of appellant in accordance with the views expressed in this opinion, decreeing appellant's right to pursue the Granite vein downward between the vertical planes of its end-lines indefinitely beneath the surface of the Cardiff claim or any other claim or claims under which the said vein may extend within the plane of such vertical lines in its downward course.

The judgment is therefore reversed and the cause remanded. Costs in favor of the appellant.

Budge and Morgan, JJ., concur.

Petition for rehearing denied.